Arthur H. Bryant (SBN 213063)
**BAILEY & GLASSER, LLP**
1999 Harrison Street, Suite 660
Oakland, CA 94612
Telephone: (510) 272-8000
Facsimile: (510) 463-0291
Email: abryant@baileyglasser.com

Gregory Y. Porter (*pro hac vice to be filed*)
Bailey Glasser LLP
1055 Thomas Jefferson St., NW, Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
gporter@baileyglasser.com

Mark G. Boyko (*pro hac vice to be filed*)
Bailey & Glasser, LLP
34 N. Gore Avenue, Suite 102
Webster Groves, MO 63119
Telephone: (202) 463-2101
mboyko@baileyglasser.com

***Attorneys for Plaintiffs***

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Daniel E. Nagy and Maria Romero on behalf of the MedAmerica, Inc. 401(k) Profit Sharing Plan<br><br>v.<br><br>CEP America, LLC (d/b/a Vituity), MedAmerica Retirement & Benefits Committee, and Jane and John Does 1–25 | Case No. 3:23-cv-05648<br><br>**CLASS ACTION COMPLAINT** |

## COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)

## I.    INTRODUCTION

1. Plaintiffs Daniel E. Nagy and Maria Romero, individually and on behalf of a class of similarly situated participants ("Plaintiffs") in the 401(k) Profit Sharing Plan for Employees of MedAmerica, Inc. (the "Plan"), and on behalf of the Plan, bring this action for breach of fiduciary duty and prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against CEP America LLC (d/b/a Vituity) ("Vituity" or "the Company"), the MedAmerica Retirement & Benefits Committee (the "Committee"), and Jane and John Does 1–25, the individual members of the Committee during the proposed class period ("Defendants").

2. The Plan is a defined contribution plan for Vituity employees (formerly employees of MedAmerica, Inc.), and its partners (formerly California Emergency Physicians) to save for their retirements. Most fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping) and investment management. Fiduciaries of defined contribution plans must engage in a rigorous process to control these costs to ensure that participants pay no more than a reasonable level of fees. This is particularly true for large plans, like the Plan, which have the bargaining power to obtain the highest level of service at the best price. Fiduciaries must also avoid self-dealing.

3. Throughout the Class Period (defined below), Defendants allowed the Plan's Recordkeeper, Schwab Retirement Plan Services, and its affiliates Schwab Bank and Charles Schwab & Co., Inc (collectively "Schwab") to receive excessive and unreasonable compensation through: (1) direct, "hard dollar" fees the Plan paid to Schwab; (2) indirect, "soft dollar" fees paid by non-Schwab managed mutual funds; (3) fees paid to Schwab from Schwab-managed investments; (4) profits from the use of Plan investments in the Schwab Bank Savings account; and (5) float interest, freedom to market rollover-materials to Plan participants, and other forms on indirect compensation.

4. During the same period, the Company also paid itself millions of dollars per year in excessive compensation from the Plan in violation of ERISA.

5. Defendants' fiduciary obligations under ERISA require that they ensure, at all times, that Plan assets are never used for the benefit of the employer, and that they scrupulously avoid any transaction in which Plan assets would be used by, or inure to the benefit of, a party in interest, such as the Company and Schwab, in connection with the Plan.

6. Defendants' obligations under ERISA also require them to avoid prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

7. Plaintiffs bring this action by and through their undersigned attorneys based upon their personal knowledge and information obtained through counsel's investigation. Plaintiffs anticipate that discovery will uncover further substantial support for the allegations in this Complaint.

## II.      NATURE OF THE ACTION

8. Under ERISA, the obligations that retirement plan fiduciaries owe to the plan's participants  and beneficiaries are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602  (8th Cir. 2009).

9. When selecting investments for a retirement plan, plan fiduciaries are required to: perform with undivided loyalty, act prudently, and defray reasonable plan expenses. ERISA §404(a)(1), 29 U.S.C. §1104(a)(1).

10. Defendants, who during the Class Period are or were fiduciaries of the Plan, have violated their fiduciary duties owed to the Plan and its participants, including Plaintiffs.

11. Defendants, during the Class Period, were responsible for selecting, monitoring, and removing the Plan's investment options and the Plan's recordkeeper, and approving or contracting for Plan administrative services. The individual Defendants were officers or employees of the Company. Instead of acting for the

COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)

exclusive benefit of the Plan and its participants and beneficiaries when performing these duties, Defendants forced the Plan into investments that benefitted Schwab at the expense of the Plan, allowed Schwab to receive excessive compensation for the services it provided, and approved Plan payments to the Company that were impermissible under ERISA.

12. Defendants had a fiduciary obligation to prudently and loyally select the investment options that would be available to the Plan's participants. That obligation required Defendants to carefully, skillfully, prudently, and diligently investigate the different investment options that they could include, and to select the best and most cost-effective options available. In so doing, they were required to act solely in the interests of the participants and beneficiaries, and choose investment options for the exclusive purpose of providing benefits to the participants and beneficiaries.

13. This class action is brought on behalf of participants in the Plan who participated at any point since November 1, 2017 (the "Class Period").

III.    **JURISDICTION AND VENUE**

14. **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it is a civil action arising under the laws of the United States, and pursuant to ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

15. **Personal Jurisdiction.** This court has personal jurisdiction over each of the Defendants because they reside and/or transact business in and have significant contacts with this District, and because ERISA provides for nationwide service of process, ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), and the Plan is and was administered in this District and the breaches of ERISA took place herein. This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in California.

16. **Venue.** Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is and was administered in Emeryville,

California, which is within this District, the breaches of ERISA took place in this District, and several defendants, including the Company, reside or may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because a defendant resides and/or does business in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## IV.    PARTIES

17. Plaintiff Daniel E. Nagy is a resident of Highland Lake, New York. He participated in the Plan during the entire Class Period until he rolled out of the Plan in 2023.

18. Nagy's individual account in the Plan was invested in at least 14 of the Plan's investment options, including the Schwab Bank Savings Account and various Exchanged Traded Funds ("ETFs"), including those managed by Schwab as well as non-Schwab managed ETFs. Nagy, like substantially all Plan participants and beneficiaries, was not provided any information regarding the substance of Defendants' deliberations, if any, concerning the Plan's menu of investment options or selection of service providers during the Class Period.

19. Plaintiff Maria Romeno is a resident of Visalia, California. She participated in the Plan during the entire Class Period. Romeno's individual account in the Plan was invested in at least 11 of the Plan's investment options, including the Schwab Bank Savings Account and various ETFs, including those managed by Schwab as well as non-Schwab managed ETFs. Romeno, like substantially all Plan participants and beneficiaries, was not provided any information regarding the substance of Defendants' deliberations, if any, concerning the Plan's menu of investment options or selection of service providers during the Class Period.

20. Plaintiffs lacked knowledge of Schwab's compensation from the Plan or from profits on the assets invested in the Savings Account, the full extent of any

administrative payments to Schwab and the Company, the recipients of and services provided for the "Plan Administrative and Other Fees" included on their account statements, the reasonable rates for large defined contribution plan recordkeeping services, alternative capital preservation investments available to large 401(k) plans, or the Plan's payments to the Company. Plaintiffs otherwise had no knowledge of the substance of the deliberations, or of the nature of the investments offered in the Plan beyond what was provided to them by the Plan. Plaintiffs discovered their claims shortly before commencing this action.

21. Defendant, the Company, is the Plan's Sponsor. It is a physician-owned and led partnership delivering medical services, with its principal place of business in Emeryville, California.

22. Defendant, the MedAmerica Retirement & Benefits Committee ("the Committee"), is comprised of employees and partners of the Company. The Committee has the authority to determine the investment funds made available under the Plan and to develop and oversee the implementation of any investment education program.

23. The Committee also oversees other ERISA plans sponsored by the Company, including (until its termination near the end of 2022) the MedAmerica Retirement Plan for CEP Physicians ("the Pension Plan").

24. Defendants Jane and John Does 1–25 are members of the Committee and/or Vituity executives in charge of Human Resources during the Class Period, who are unknown to Plaintiffs.

25. Defendants are, or during the Class Period were, fiduciaries to the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii), and parties in interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

## V.   FACTS

### A.   *The Plan and its Administration.*

26. The Plan is an employee benefit plan within the meaning of ERISA §3(3), 29 U.S.C. §1002(3), which is subject to the provisions of Title I of ERISA pursuant to ERISA §4(a), 29 U.S.C. §1003(a).

27. The Plan is also an "employee pension benefit plan" or "pension plan" as defined by ERISA §3(2)(A), 29 U.S.C. §1002(2)(A), and "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).

28. The Plan covers eligible employees of the Company.

29. The Company is the Plan Administrator. Accordingly, it had (and has) exclusive authority and responsibility for all matters in connection with the operation and administration of the Plan, including the authority and responsibility to invest, manage, and control the assets of the Plan specifically allowed to the Trustee. At some or all times during the Class Period, it delegated some or all of these responsibilities to the Committee and its members.

30. The Plan is recordkept by Schwab Retirement Plan Services, Inc., which provides recordkeeping and related services with respect to retirement plans.

31. The Charles Schwab Corporation ("Schwab") provides services to retirement and other benefit plans and participants through its affiliated companies and subsidiaries: Charles Schwab & Co., Inc; Charles Schwab Trust Bank; Charles Schwab Bank, SSB; Schwab Retirement Technologies, Inc., and Schwab Retirement Plan Services, Inc. Brokerage products and services are offered by Charles Schwab & Co., Inc. (Member SPIPC). Trust, custody, and deposit services and products are provided by Charles Schwab Trust Bank and Charles Schwab Bank, SSB, Member of FDIC. Collectively, Plaintiffs use the term "Schwab" to refer to The Charles Schwab Corporation and its affiliated companies and subsidiaries.

32. Charles Schwab Trust Bank was the Trustee of the Plan. As such, it, and all Schwab entities, was and is a party-in-interest under ERISA. The Trustee serves at the direction of the Plan Administrator.

33. Plan participants have their own accounts within the Plan to which they may contribute a portion of the compensation they earn from their employment at the Company. The Company also has the discretion to compensate employees through matching contributions. Participants can direct the investment of the assets allocated to their individual accounts into the investment options approved by the Committee and offered by the Plan, and the return on those investments are credited to each participant's account.

34. During the Class Period, the Plan invested in approximately 15 different investment options, approximately half of which were managed by Schwab or its affiliated entities. In addition, the Plan included a brokerage window, the Schwab Personal Choice Retirement Account, which provided a "participant self-directed brokerage account" from which plan participants could select other options managed by, or paying revenue sharing to, Schwab.

35. The Plan's most recent Form 5500 filing with the U.S. Department of Labor states that at the end of the 2022 plan year the Plan had 6,232 participants with account balances.

36. Schwab served as the Plan's Recordkeeper for the entirety of the Class Period.

37. The Recordkeeper of a defined contribution plan, like the Plan, maintains participant account balances, provides a website and telephone number for Plan Participants to monitor and control their Plan accounts, and provides various other services to the Plan.

38. These services are highly commoditized, with little or nothing distinguishing the services provided by one recordkeeper over another across comparably-sized plans.

COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)

39. The cost of providing these services depends on the number of participants. Plans with large numbers of participants can take advantage of economies of scale to negotiate a much lower per-participant fee for recordkeeping services compared to smaller plans.

40. Because recordkeeping costs are not affected by account size, prudent fiduciaries negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan, instead of a percentage of plan assets. Otherwise, as plan assets increase (such as through participant contributions and investment gains), recordkeeping compensation increases without any change in recordkeeping services.

41. For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

42. At best, these fee structures are complicated and confusing when disclosed to Plan participants. At worst, they are excessive, undisclosed, and illegal.

43. The compensation Schwab received for its recordkeeping of the Plan was excessive and unreasonable, and the Defendants breached their fiduciary obligations under 29 U.S.C. §1104(a) to ensure that Schwab only received reasonable compensation.

44. The Committee also failed to have a prudent process for evaluating the amount and reasonableness of Schwab's compensation. Instead of evaluating the cost of these services in the marketplace, the Committee permitted Schwab to serve as the recordkeeper for the Plan without meaningful market competition. Defendants allowed Schwab to generate higher fees even though market rates for recordkeeping services dropped during the relevant period.

45. Defendants' failure to control the Plan's excessive expenses constituted a breach of the duties of prudence in violation of 29 U.S.C. §1104(a) and cost the Plan

COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)

millions of dollars in excessive fees charged directly by Schwab or collected by Schwab from the Plan's investment options through revenue sharing.

46. Pursuant to 29 U.S.C. §1109, the Defendants are personally liable to make good to the Plan any losses to the Plan resulting from these breaches, as well as any other equitable or remedial relief the Court deems appropriate.

### B.    Schwab's Sources of Compensation

47. Defendants caused the Plan to purchase recordkeeping, administration, investment management, and other services from various institutions and entities.

48. Defendants caused the amounts that the Plan paid for these services to be assessed against Plan participants' accounts.

49. The fees paid to Schwab were unreasonable and excessive, especially in light of the Plan's significant size.

50. Defendants caused or allowed Schwab to receive payment in at least five ways: (1) by direct disbursement from the Plan to the entity providing the service; (2) by receiving, or having the opportunity to receive, "Revenue Sharing" payments from Plan investments distributed between or among various service providers; (3) by profiting from the inclusion of proprietary Schwab-managed ETFs, which charged fees to all investors, including the Plan; (4) by profiting from the use of assets "invested" in the Schwab Savings Account; and (5) through other sources of compensation, including float interest and access to plan participants for marketing purposes.

### i.    Reported Compensation to Schwab

51. The direct disbursements to the Plan and revenue sharing payments from Plan investments were calculated and reported to the United States Department of Labor annually. They were reported as:

COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)

| Year | Plan Participants with Balances | Schwab's Compensation from the Plan | Schwab Compensation Per Participant |
|------|------|------|------|
| 2017 | 5,053 | $1,530,982 | $302.98 |
| 2018 | 5,261 | $1,328,839 | $252.58 |
| 2019 | 5,393 | $2,133,363 | $395.58 |
| 2020 | 5,472 | $2,472,019 | $451.76 |
| 2021 | 5,695 | $1,455,403 | $255.56 |
| 2022 | 6,232 | $1,837,611 | $294.87 |
| **Total** | | **$10,758,217** | |

52. Direct disbursements include payments made directly from the Plan or Plan Participants to Schwab out of Plan assets.

53. Revenue Sharing is the transfer of asset-based compensation from brokers or investment management providers (such as mutual funds, common collective trusts, insurance companies offering general insurance contracts, and similar pooled investment vehicles) to administrative service providers (record-keepers, administrators, trustees) in connection with 401(k) and other types of defined contribution plans.

54. For example, a plan or its agent (e.g., a third-party administrator, consultant, or similar fiduciary) seeking to invest plan assets in an investment vehicle (e.g., a mutual fund, common and collective trust, guaranteed investment contract, ETF, etc. (collectively a "Fund")) will negotiate the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing (which is included within the expense ratio).

55. In Revenue Sharing arrangements, the plan and the Fund agree upon an asset-based fee (i.e., an expense ratio) that is not the true price for which the Fund will provide its service.

56. Instead, the agreed asset-based fee includes **both** the actual price for which the Fund will provide its service **and** additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

57. The additional portion of the agreed-upon asset-based charge is "shared" with plan service providers or others who do business with the plan or the Fund.

58. As a result of Revenue Sharing arrangements, plan service providers or others who do business with the plan or the Fund can receive *both* direct disbursements from the plan *and* additional revenue that the Fund "shares" with them.

59. These amounts were reported by Schwab to Defendants and reflected in the Plan's Form 5500s filed with the U.S. Department of Labor.

### ii.    Unreported Compensation to Schwab

60. Fiduciaries have an obligation to understand all sources of compensation a plan service provider, like Schwab, receives and to make sure the total compensation is not more than a reasonable amount.

61. The compensation Schwab received from the proprietary Schwab-managed ETFs, which charged fees to all investors, including the Plan, the profit from the use of assets "invested" in the Schwab Savings Account, and the additional benefits to Schwab from float interest and cross-marketing to plan participants, are not reflected in the compensation reported to the U.S. Department of Labor or included in the table above.

62. Schwab has been known to, and did, engage in "aggressive marking and promotional efforts" to "leverage cross-marketing opportunities", as it reported in 10-K filings to the Securities Exchange Commission.

63. Defendants did not consider, measure, or compare the value to Schwab from cross-marketing to plan participants when evaluating the reasonableness of Schwab's compensation.

64. Float interest refers to the profit Schwab received while money was moving into and out of the Plan and Plan investments.

65. Specifically, uninvested deposits and withdrawals were placed in the Schwab Bank Sweep for Employee Benefit Plans (the "Sweep Account"). The Sweep Account is a deposit account at Charles Schwab Trust Bank (prior to January 1, 2020, at Charles Schwab Bank).

66. The interest rate for the Sweep Account is determined by Charles Schwab Trust Bank in its sole discretion and Charles Schwab Trust Bank's compensation comes from the "spread" between what it earns for investing and lending activities and the interest rate it pays participants.

67. At no point during the relevant period did the Sweep account pay participants more than 0.70% interest. The Sweep account currently (as of October, 2023) pays 0.45%, as it has done since December 27, 2022 even as interest rates in the market place have grown by several percentage points since that date. From March 17, 2020 until June 23, 2022, the Sweep Account paid only 0.01% interest.

68. Schwab offers other investors sweep accounts, including the Schwab Value Advantage Money Fund – Ultra Shares, which is currently paying 5.39% interest, more than ten times the interest paid to the Plan's Sweep account.

69. Comparable sweep accounts provided by other brokers in the marketplace also pay at least ten times more than the Sweep Account. For example:

| Market-rate Sweep Account | Current Interest Paid | Comparison to Sweep Account's 0.45% interest |
|---|---|---|
| Vanguard Fed. MMkt. (VMFXX) | 5.39% | 1,098% higher |
| Dreyfus Govt. Cash Mgmt. (DGCXX) | 5.23% | 1,062% higher |
| Fidelity Govt. MMkt. (SPAXX) | 4.99% | 1,009% higher |
| Dreyfus Gen. MMkt. (GMMXX) | 5.02% | 1,015% higher |

70. The Sweep account does not offer any services or features that differentiate it materially from other sweep accounts in the market, such as those listed above.

71. Defendants did not consider, measure, or compare the value to Schwab from the Sweep Account in evaluating the reasonableness of Schwab's compensation.

72. While float interest and cross-marketing represented benefits and compensation Schwab received in exchange for its services to the Plan, the vast majority of the unreported benefit to Schwab came from the Plan's investment in the Schwab Savings Account.

73. When Defendants selected Schwab as recordkeeper for the plan, they were required to select at least one investment option in the "Capital Preservation asset category".

74. Schwab provides three general choices within this category, a "Money Market Fund," a "Stable Value Fund," and the "Schwab Bank Savings" (the "Savings Account").

75. While the three options have certain differences, they have similar characteristics with respect to liquidity and safety.

76. If a fiduciary selects the Savings Account, Schwab requires it to "acknowledge[] and agree[] that Schwab Bank Savings is a proprietary product of Schwab and its affiliates and that it has reviewed and determined the prudence and permissibility of such feature for the Plan." Defendants acknowledged and agreed.

77. The Savings Account was a capital preservation option in which a portion of participant's Plan accounts could be sent to a savings deposit at Charles Schwab Bank. The participant received a beneficial interest in the Plan's deposit account, which was backed by the credit worthiness of Schwab Bank.

78. Like with the Sweep Account, the benefit to Schwab was the "spread", or the difference between the interest rate paid on the Savings Account (and other costs of maintaining the Savings Account) and the interest rate and other income earned by

COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)

Schwab Bank on the loans and investments made with the funds. Schwab Bank used and intended to use the Plan's investment in the Savings Account to fund current and new lending activities and investments.

79. Defendants had, and have, a fiduciary obligation to determine that the interest rate on the Savings Account was reasonable and the use of the Savings Account was prudent and proper in light of other options available.

80. While the "spread" on the Savings Account is a closely-guarded secret, there is no secret that in early 2023 Schwab decided to issue bonds in order to *also* fund its lending activities and investments. Schwab chose to do so even though the market demanded Schwab agree to pay 5.64% interest on bonds maturing in 2029, a 2% premium to the 10-year US Treasury note.

81. Since the Plan's $54 million was available to Schwab for the same purposes, but for the Plan's $54 million contribution to the Savings Account, Schwab would have needed to pay $3 million per year in interest to secure an additional $54 million through the bond market to fund its lending activities and investments.

82. Instead, at the time it went to the market for bonds, it was paying a mere 1.8% to the Plan on the Savings Account (and somewhere between 0.02% and 0.4% more for FDIC insurance), a benefit to Schwab of $2 million per year as a result of its relationship with the Plan and Defendants' decision to include the Savings Account for plan assets.

83. In other words, if the terms of the Plan's quasi-loan were set by the market, the Plan would have received over $2 million more in interest —over twice the interest the Plan actually received.

84. In addition, the Savings Account yields were far below those of comparable capital-preservation investments available to the Plan.

85. For example, in March 2023, while the Savings Account yielded 1.8%, several products with comparable risk and liquidity profiles yielded far higher returns for

investors. Schwab itself marketed a Money Market Fund, the Schwab Value Advantage Money Fund – Ultra Shares, (ticker SNAXX), which was yielding approximately 4.5% at the same period, and a stable value fund yielding 2.92%, both of which were marketed as safe capital-preservation investments.

86. Schwab specifically notes in material provided to plan sponsors that "it can be helpful to view the average annual percentage yield" of the Schwab Bank Savings' account, "with a money market fund index with similar characteristics (liquidity, safety)."

87. The comparison Schwab provides notes the dramatically lower yield offered by the Savings Account:



88. The inferiority of the Savings Account as a capital preservation option in a 401(k) plan long pre-dates October 2022. For example, in August 2019, the yield Schwab paid on the Savings Account was 1.35% even as money market funds, like the Schwab Money Market Fund, were paying over 2.1% in interest.

89. In fact, the interest rate for the Savings Account has consistently fallen well short of capital preservation options with similar liquidity and safety profiles. Measured against the US Government Money Market Fund average, the Plan's losses from the decision to include the Savings Account exceed $1.5 million. Meanwhile, compared to the interest rates Schwab would have had to pay to finance the same amount of money for its business purposes, the benefit to Schwab has been nearly $10 million, and exceeds $10 million if the interest is compounded over the period.

| Year | Savings Account Interest Rate | US Government Money Market Funds Average | Plan Investment in Savings Account [1] | Plan losses from Savings Account | Schwab's cost of credit[2] | Estimated Benefit to Schwab |
|---|---|---|---|---|---|---|
| 2023 YTD | 1.94% | 4.40%[3] | $38,347,885 | $786,132 (through Oct. 30,2023) | 5.86% | $1,252,698 (through Oct. 30,2023) |
| 2022 | 0.60% | 1.25% | $53,998,586 | $350,991 | 4.95% | $2,348,938 |
| 2021 | 0.09% | 0.02% | $57,318,890 | ($40,123) | 3.45% | $1,925,915 |
| 2020 | 0.40% | 0.24% | $35,028,089 | ($56,045) | 2.89% | $1,012,312 |
| 2019 | 1.40% | 1.61% | $34,192,625 | $71,805 | 4.14% | $936,878 |
| 2018 | 0.84% | 1.23% | $32,885,493 | $128,253 | 4.91% | $1,338,440 |
| **Average / Total** | **0.88%** | **1.46%** | | **$1,241,013** | | **$8,815,180** |

90. Out of over 625,000 401(k) plans in the United States, Plaintiffs are not aware of a single plan that invested in the Savings Account without also having Schwab as the Plan's Recordkeeper.

91. The vast majority of plans that do contract with Schwab for recordkeeping services do not use the Savings Account as their capital preservation option, but instead use a money market fund, a stable value fund, or both.

---

[1] As of the beginning of each year

[2] Measured as the average 10-year treasury yield plus 2%

[3] 2023 YTD uses the Morningstar Category Average for Prime Money Market Funds as of September 30, 2023

92. Beyond the Schwab Savings Account, few other 401(k) plans use any bank savings account as the capital preservation option for plan participants.

93. Average interest rates paid on money market funds available to large 401(k) plans (as shown above), and average crediting rates available to stable value funds, which exceeds 2% per year over the period above,[4] far exceed the rate of return of the Savings Account without a significant difference in risk.

94. In determining whether a Plan Administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the Plan are reasonable and incurred solely in the interest of Plan participants, all sources of compensation must be taken into account.

### C.   Excessive Recordkeeping Fees

95. Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to a large defined contribution plan like the Plan. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

96. The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or

---

[4] Measured using the Hueler Stable Value Index.

investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services.

97. Large defined contribution plans, like the Plan, experience economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee charged for recordkeeping and administrative services decline. These lower administrative expenses are readily available for plans with a greater number of participants.

98. Market prices for large plans like the Plan (i.e., plans with more than 5,000 participants and over $1 billion in assets) are typically considerably lower because of available economies of scale and the bargaining power exerted by prudent fiduciaries. *See, Tussey v. ABB, Inc.*, 2012 WL 1113291, *11 (W.D.Mo. 2012) (determining after a trial that recordkeeping fees of around $100 per participant per year were excessive for a plan with 12,567 participants), vacated in part but affirmed as to recordkeeping at 746 F.3d 327 (8th Cir. 2014); *Cryer v. Franklin Resources, Inc.*, No. 16-cv-4265, 2018 WL 6267856, *10 (N.D. Cal. Nov. 16, 2018) (noting that prior to 2013 Schwab recordkept the Franklin 401(k) plan for $70 per participant per year and after a competitive bidding process the fiduciaries replaced Schwab with Bank of America Merrill Lynch, which charged $48 per participant).

99. In the *Cryer* case, plaintiffs alleged recordkeeping costs were excessive. The fiduciary defendants hired an expert, Dr. Gissiner, who compared the recordkeeping fees paid by Franklin to other plans of similar size where he had knowledge of the recordkeeping fee arrangements they were able to obtain. His comparable size was 2,500 to 15,000 participants, with most plans having more than 5,000 participants (just as the MedAmerica Plan does). He reviewed recordkeeping fees paid in 2017 among 9 plans similar to the Franklin 401(k) Plan (using criteria that would also include the MedAmerica Plan) and found the range of fees was $48.00 to $86.15, with an average fee of $69.88. Ex. 1 at ¶ 44. The expert also relied on New England Pension

Consulting's Annual Defined Contribution Plan & Fee Survey, which is a survey he "regularly relied on in connection with my benchmarking work to confirm pricing trends in the recordkeeping market." *Id*. at ¶ 46. The 2021 version of that report gives a benchmark fee for recordkeeping, trust, and custodial services (the services Schwab provided here) averaging under $50 per participant for plans the size of the MedAmerica plan. See Ex. 2, excerpt from 2021 NEPC survey. While the NEPC survey suggests that reasonable fees to Schwab here should have been less than $50, even a defense expert like Dr. Gissiner is willing to testify that an average fee is under $70 and the top of the range is $86. In comparison, the Plan has been paying Schwab over $250 per participant per year and *also* paying MedAmerica, as discussed below, nearly $300 per participant per year. Thus, the Plan's administrative fees were over 6 times higher than the highest amount an expert for a defendant fiduciary observed during the relevant time period and more than 10 times higher than the average administrative costs shown in the NEPC survey.

100. For these fees, Schwab provided only standard services typical of other recordkeepers, including Trustee services and the offering of a brokerage window (which included fees and revenue sharing).

101. To ensure that plan administrative expenses are reasonable, prudent fiduciaries of large defined contribution plans, such as the Plan, put plan recordkeeping and administrative services out for competitive bidding at regular intervals of three to five years, but Plaintiffs are not aware of any effort by Defendants to do so during the relevant period here.

102. Taking into account the administrative services required by the Plan and provided by Schwab, the Plan's participant level, and the market rates for these services, the outside limit of a reasonable recordkeeping fee for the Plan would have been far below the $255+ per year Schwab disclosed as compensation, not even

1  factoring in the massive undisclosed benefits, including the nearly $9 million benefit

2  from the use of funds invested in the Schwab Savings Account.

3      103. Accounting for Schwab's compensation through disclosed and undisclosed

4  sources, the Plan paid Schwab approximately $20 million in excessive fees.

5      104. These damages do not reflect the opportunity cost to the Plan of having

6  excessive fees deducted in each year. Had the excessive fees paid to Schwab instead

7  remained in the Plan, and been invested, the Plan would have significantly more than

8  $20 million in additional assets.

9      ***D.     The subsidization***

10     105. Of course, one wonders why Defendants would allow Schwab such

11  extraordinary levels of compensation from the Plan.

12     106. As it turns out, Schwab was also the Trustee of the Defined Benefit Plan,

13  the MedAmerica Retirement Plan for CEP Physicians (the "Pension Plan"), for which

14  the Committee is also a fiduciary with responsibility over Schwab's compensation.

15     107. Unlike the 401(k) Plan, where Schwab's fees are ultimately paid by the

16  Plan Participants, either directly or indirectly through lower returns on their

17  investments, Schwab's compensation for services to the Pension Plan is borne by the

18  Company, directly or indirectly, because it is ultimately liable for the payment of

19  benefits under the Pension Plan.

20     108. Schwab is identified as being the "Trustee" of the Pension Plan, just as it is

21  identified for the 401(k) plan. However, Schwab's compensation was very different:

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)

| Year | Plan Participants with Balances (401k) | Plan Participants (Pension) | Schwab's Compensation from the 401(k) Plan | Schwab's Compensation from the Pension Plan |
|---|---|---|---|---|
| 2017 | 5,053 | 1,485 | $1,530,982 | $0 |
| 2018 | 5,261 | 1,357 | $1,328,839 | $0 |
| 2019 | 5,393 | 1,565 | $2,133,363 | $0 |
| 2020 | 5,472 | 5,393 | $2,472,019 | $0 |
| 2021 | 5,695 | 2,275 | $1,455,403 | $0 |
| 2022 | 6,232 | 2,481 | $1,837,611 | $0 |

109. Thus, while Schwab received over $10 million from the 401(k) Plan since 2017, an excessive amount for the services provided, it charged the Pension Plan nothing at all despite providing similar services.

110. The massive excesses in Schwab's compensation from the 401(k) plan compared to market rates, combined with the lack of *any* payments from the Pension Plan to Schwab was known to Defendants and suggests Defendants caused the 401(k) Plan to subsidize the Pension Plan for the benefit of the Company.

### E.    The Plan's Payments to the Company

111. In addition to the excessive payments to Schwab, some of the administrative costs were charged by the Company for services provided to the Plan by the Company's employees and agents.

112. Thus, along with the benefit to the Company from subsidization of the Pension Plan, the Company also collected direct compensation from the Plan.

113. Defendants owed the Plan a duty of loyalty requiring that the services paid for by the Plan were for the exclusive purpose of providing benefits to participants and their beneficiaries.

114. Defendants understood that the administrative fees being charged to the Plan by the Company were excessive, yet failed to eliminate these excessive costs.

115. These payments, from the Plan to the Plan Sponsor, were prohibited transactions and, even if they were not, were excessive in light of the services the Company provided to the Plan.

116. The Company determined the amount of compensation it received from the Plan for administrative services provided to the Plan and was reimbursed by the Plan.

117. The Company exercised authority delegated to it by the Committee to create its own budget for reimbursement by the Plan and review its own compensation from the Plan.

118. The Company employees whose salaries and expenses were reimbursed by the Plan were working in their capacity as Company employees in performing the administrative services charged to the Plan.

119. In performing the tasks described above, the Company exercised authority or control over the Plan and, accordingly, was a fiduciary under ERISA.

120. The Company selected the individuals who comprised the Committee.

121. As this table shows, the payments to the Company ranged from $236–$411 per participant per year:

| Year | Plan Participants with Balances | Company Compensation from the Plan | Company Compensation Per 401(k) Plan Participant |
|------|------|------|------|
| 2017 | 5,053 | $1,429,361 | $282.87 |
| 2018 | 5,261 | $1,401,658 | $266.42 |
| 2019 | 5,393 | $1,470,581 | $272.68 |
| 2020 | 5,472 | $1,292,998 | $236.29 |
| 2021 | 5,695 | $2,343,346 | $411.47 |
| 2022 | 6,232 | $1,935,936 | $310.49 |

COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)

| Total | | **$9,873,880** | |
|---|---|---|---|

122. "Settlor expenses," which are business expenses related to a retirement plan, cannot be paid by the Plan, only reasonable administrative expenses can be paid by the Plan.

123. The amounts charged by the Company to the Plan were far in excess of reasonable administrative expenses—especially in light of the fact that the Plan was also paying Schwab $255 a year per participant.

124. As shown above, ***total administrative expenses*** for comparable 401(k) plans was well below $100 per participant per year, yet combining Schwab's compensation and the Company's, the Plan was paying over $600 in disclosed administrative fees and nearly $1,000 per participant per year when Schwab's undisclosed compensation, including its spread on the Saving Account, is taken into account.

125. Even in the absence of *any* compensation going to Schwab, the administrative expenses charged by the Company were excessive.

**VI.    ERISA'S FIDUCIARY STANDARDS**

126. ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants  as fiduciaries of the Plan. ERISA § 404(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest  of the participants and beneficiaries and —
> (A)   for the exclusive purpose of:
> > (i)   providing benefits to participants and their beneficiaries; and
> > (ii)   defraying reasonable expenses of administering the plan; [and]
> (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and  familiar with such matters would use in the conduct of an enterprise of like  character and with like aims;
> (C)   by diversifying the investments of the plan so as to minimize the  risk of large losses, unless under the circumstances it is clearly

prudent not to do so[.]

127. ERISA also imposes co-fiduciary duties on plan fiduciaries. ERISA § 405, 29 U.S.C. § 1105, states in relevant part that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)  if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)  if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

128. Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants and beneficiaries of the plan when performing such functions. Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

129. As the Department of Labor explains,

> [T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

130. Pursuant to these duties, fiduciaries must ensure that the services provided to the  plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act  prudently and solely in the interest of the Plan participants and beneficiaries … in  determining which investment options to utilize or make available to Plan  participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service  providers] is reasonable.

DOL Opinion 97-15A (1997); DOL Opinion 97-16A (1997).

131. A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of  plan participants and beneficiaries. As the Department of Labor has warned:

> [T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and  beneficiaries, as prohibiting a fiduciary from subordinating the interests of  participants and beneficiaries in their retirement income to unrelated objectives.  In other words, in deciding whether and to what extent to invest in a particular  investment, or to make a particular fund available as a designated investment  alternative, a fiduciary must ordinarily consider only factors relating to the  interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988).

132.     Additionally, the Department of Labor has repeatedly warned:

> While the law does not specify a permissible level of fees, it does require that fees  charged to a plan be "reasonable." After careful evaluation during the initial  selection, the plan's fees and expenses should be monitored to determine whether  they continue to be reasonable.

*Meeting Your Fiduciary Responsibilities*, U.S. Dep't of Labor Employee Benefits

Security Admin. (Feb. 2012),

http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

133.     In a separate publication, the Department of Labor wrote:

> The Federal law governing private-sector retirement plans, the Employee  Retirement Income Security Act (ERISA), requires that those responsible for  managing retirement plans -- referred to as fiduciaries -- carry out their  responsibilities prudently and solely in the interest of the plan's participants and  beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that  the services provided to their plan are necessary and that the cost of those services is reasonable.
>
> * * *
>
> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently  select and monitor plan investments, investment options made available to the  plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

*Understanding Retirement Plan Fees and Expenses*, U.S. Dep't of Labor Employee

Benefits Security Admin. (Dec. 2011),

http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

134. In addition, ERISA prohibits certain transactions outright. ERISA § 406(a), 29 U.S.C. § 1106(a), prohibits a fiduciary from "causing the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect— … (B) lending of money or other extension of credit between the plan and a party in interest; … [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets or the plan.

135. Furthermore, ERISA § 406(b), 29 U.S.C. § 1106(b), provides that "A fiduciary with respect to the plan shall not — (1) deal with the assets of the plan in his

own interest or for his own account; (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

136. ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), provides a cause of action against a party in interest, such as the Company, for participating in a breach of a fiduciary duty by an ERISA plan fiduciary.

137. ERISA § 405(a), 29 U.S.C. §1105(a), provides a cause of action against a fiduciary, such as the Company, for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

138. ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409, 29 U.S.C. § 1109, further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

## VII.   CLASS ACTION ALLEGATIONS

139. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan fiduciary, participant, beneficiary, or the Secretary of Labor to bring a suit individually on behalf of the Plan to recover for the Plan the remedies provided under ERISA § 409, 29 U.S.C. § 1109(a).

140. In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to

direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of:

> All participants in the Plan from November 1, 2017 to the date of judgment. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

141. Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

(a)     The class satisfies the numerosity requirement of Rule 23(a) because it is composed of over five thousand persons, in numerous locations. The number of class members is so large that joinder of all its members is impracticable.

(b)     The class satisfies the commonality requirement of Rule 23(a) because there are questions of law and fact common to the Class and these questions have common answers. Common legal and factual questions include, but are not limited to: (i) who are the fiduciaries liable for the remedies provided by ERISA § 409(a), 29 U.S.C. §1109(a); (ii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by causing the Plan to invest in the Schwab Savings Account; (iii) whether the decision to include and not to remove that fund was made solely in the interests of Plan participants and beneficiaries; (iv) whether the Plan's investment in the Schwab Savings Account constituted one or more Prohibited Transactions; (v) whether the compensation paid to Schwab to serves as recordkeeper for the Plan was reasonable in light of the services provided; (vi) whether the payments from the Plan to the Company violated ERISA's fiduciary duties or constituted Prohibited Transactions; (vii) what are the losses to the Plan resulting from each; and (viii) what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)

(c)   The class satisfies the typicality requirement of Rule 23(a) because Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and the claims of all Class members, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiffs were investors in the Plan during the Class Period, and also invested in the Schwab Savings Account.

(d)   The class satisfies the adequacy requirement of Rule 23(a). Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

(e)   Class action status in this action is warranted under Rule 23(b)(1)(A) because  prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would  substantially impair or impede their ability to protect their interests.

(f)   In the alternative, certification under Rule 23(b)(2) is warranted because  Defendants acted or refused to act on grounds generally applicable to the Class, thereby making  appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the

Class as a whole.

(g)   In the alternative, certification under Rule 23(b)(3) is appropriate because   questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII.   CLAIMS FOR RELIEF

### A.   *Count I - Breach of Fiduciary Duties in Connection with the Schwab Savings Account*

142. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

143. Defendants had a fiduciary obligation to prudently and loyally select the investment options that would be available to the Plan's participants. That obligation required the fiduciaries to carefully, skillfully, prudently, and diligently investigate the different investment options that they could include, to select the best and most cost-effective options available, and to continue to monitor the Plan's investments and remove imprudent ones. In so doing, they were required to act solely in the interests of the participants and beneficiaries, and choose investment options for the exclusive purpose of providing benefits to the participants and beneficiaries.

144. An investment is not prudent if it "would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk." 29 C.F.R. § 2509.94-1

145. Defendants caused the Plan to invest over $50,000,000 in a Schwab Bank Savings account as the Plan's capital preservation option.

146. Savings accounts generally, and the Schwab Bank Savings account in particular, are almost never used as capital preservation options within 401(k) plans. Instead, plans rely on other safe, but higher-yielding, investments.

147. Numerous money market and stable value funds are available in the marketplace from a variety of providers, including Schwab, that offered far higher rates of return with commensurate degrees of risk.

148. In addition to, or instead of, stable value funds, some 401(k) Plans include money market funds as capital preservation options. As with stable value funds, no 401(k) plan has ever lost principle by investing in money market funds, and, therefore, the risk characteristics are comparable to the Schwab Savings Account.

149. Schwab itself offers money market funds, including the Schwab Value Advantage Money Fund – Ultra Shares, for investors, like the Plan, with over $1 million in assets. Schwab charges less than 0.20% on money invested in that Fund, and the returns have far exceeded those of the Savings Account, as alleged above at paragraphs 68 and 85.

150. The Defendants utilized the Schwab Vale Advantage Money Fund – Ultra Shares for capital preservation in the Pension Plan, but not in the 401(k) Plan.

151. Defendants failed to remove the Savings Account even though a prudent fiduciary would have done so, given the high fees, poor performance prospects, and availability of lower-cost alternatives.

152. By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

153. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

154. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess investment management and other fund-related fees during the Class Period, and suffered lost opportunity costs that continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

## B.   Count II – Prohibited Transactions Related to the Savings Account

155. ERISA § 406(a)(1)(B) provides that a fiduciary with respect to the Plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect lending of money or other extension of credit between the plan and a party in interest (here, Schwab).

156. The Schwab Savings Account was, in effect, a lending of money from the Plan for Schwab's own use and benefit. The Plan assets allocated to the Savings Account were used by Schwab Bank to fund Schwab's current and new lending activities and investments — in order words, it was money borrowed from the Plan to fund Schwab's business. The profitability of Schwab's loans and investments, less any amount it *chose* to pay in interest on the loan, was entirely profit for Schwab and neither the Plan nor any participant had any right to it.

157. Neither the Plan nor the Plan Participants acquired any equity stake in Schwab or any of Schwab's investments financed by the Plan's money by virtue of allocating money to the Schwab Savings Account.

158. Even worse than a typical loan, Schwab was given full discretion to change the interest rate it paid on the money it borrowed from the Plan without limitation. Schwab Bank established the interest rate on the last business day of each calendar month, which would be the interest rate from the day following the last business day of the month until the last business day of the following calendar month. Schwab Bank was also given discretion to change: (i) the day on which it establishes the current

interest rate, (ii) the time at which it makes the rate available, and (iii) the time period during which the interest rate is fixed. If the Plan or any participant wanted to make a withdrawal, Schwab Bank reserved the right to require seven business days' prior written notice before funding the withdrawal.

159. During the Class Period, Schwab's credit rating has fluctuated between A+ and A-. However, the interest rate paid on the Savings Account was far below the yield on loans backed by A-, A or A+ rated companies. For example, in March 2023 the Savings Account yield paid to the Plan and its participants was 1.8% while the effective yield on Single-A rated US Corporate bonds averaged over 5%.

160. In fact, Schwab obtained loans at the same time in market transaction in which it paid 5.64% in interest, even as the Plan received only 1.8% in interest for lending to Schwab.

161. While the Savings Account does offer a limited amount of FDIC insurance, the difference in yield far exceeds the cost or value of such insurance.[5]

162. Furthermore, FDIC insurance had little or no real value in the Plan, since the Plan is protected by a fidelity bond, as required by ERISA, and Securities Investor Protection Corporation (SIPC) coverage, and since the U.S. government protects the value of US Government Money Market Funds similarly to the level of protection offered by the FDIC.

163. As described in Count I, the yield on the Savings Account was also far below other comparable capital preservation products such as Schwab's own money market funds and stable value funds.

164. Each time the Plan and its participants lent money to Schwab, a party-in-interest, Defendants engaged in prohibited transactions under ERISA § 406(a)(1)(B).

---

[5] https://www.fdic.gov/deposit/insurance/assessments/proposed.html

COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)

165. In the alternative, these transactions were prohibited under other provisions of ERISA § 406(a)(1). Defendants engaged in Prohibited Transactions related to the Savings Account in that the transfer of Plan assets into the Savings Account "constitute[d] a direct or indirect sale or exchange, or leasing, of [] property between the plan and a party in interest" (ERISA § 406(a)(1)(A)), "a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest" (ERISA § 406(a)(1)(C)), and "a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." ERISA § 406(a)(1)(D).

166. As such, each Plan investment in the Savings Account was a Prohibited Transaction under ERISA § 406(a)(1)(A)–(D).

### C.   Count III – Breach of Fiduciary Duty in Connection with Payments to the Company

167. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

168. As set forth in detail above, Defendants breached their fiduciary obligations to the Plan and its participants by engaging in impermissible self-dealing with respect to the administrative services provided by the Company to the Plan.

169. ERISA § 404(a)(1)(A) requires fiduciaries to discharge their duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries and (ii) defraying reasonable expenses of administering the plan.

170. Defendants breached both of these provisions in that the payments to the Company were excessive and unreasonable and also were not solely in the interests of participants and beneficiaries, but rather were made to provide benefits to the Company.

171. Additionally, ERISA § 404(a)(1)(B) requires fiduciaries to act "with the case, skill, prudence, and diligence under the circumstances then prevailing that a

1    prudent man acting in a like capacity and familiar with such matters would use in the
2    conduct of an enterprise of a like character and with like aims."

3    172. Defendants violated this prudent man standard as well in their willingness
4    to subject the Plan to excessive and self-interested fees.

### D.    Count IV – Prohibited Transactions in Connection with Payments to the Company

7    173. Plaintiffs repeat and reallege each of the allegations set forth in the
8    foregoing paragraphs as if fully set forth herein.

9    174. The payments from the Plan to the Company also constitute prohibited
10   transactions under ERISA §§ 406(a)(1)(D), (b)(1), (b)(2), and (b)(3).

11   175. ERISA § 406(a)(1)(D) prohibits a fiduciary from "caus[ing] the plan to
12   engage in a transaction, if he knows or should know that such transaction constitutes
13   a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any
14   assets of the plan."

15   176. The Company was a party in interest.

16   177. Defendants knew that the Company was receiving money from the Plan.

17   178. Therefore the transactions were prohibited by ERISA § 406(a)(1)(D).

18   179. ERISA § 406(b)(1) prohibits a fiduciary from "deal[ing] with the assets of
19   the plan in his own interest or for his own account."

20   180. The Committee members, who were executives at the Company, and the
21   Company itself, which appointed the Committee members to the Committee, were
22   fiduciaries to the Plan.

23   181. By hiring and paying the Company to provide administrative services,
24   these fiduciaries dealt with the assets of the plan in their own interest.

25   182. Therefore, the transactions were prohibited by ERISA § 406(b)(1).

26   183. ERISA § 406(b)(2) prohibits a fiduciary "in his individual or in any other
27   capacity" from acting "in any transaction involving the plan on behalf of a party (or

28

represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."

184. Since the Company was a fiduciary and since the Company's interests were directly adverse to the Plan's with respect to any arrangement or fees charged by the Company to the Plan, the arrangement and payment of fees were prohibited transactions in violation of ERISA § 406(b)(2).

185. ERISA § 406(b)(3) prohibits a fiduciary from receiving any consideration for his own personal account from any party dealing with the plan in connection with a transaction involving the assets of the plan.

186. The Company, as a fiduciary, received payment from the Plan for its role as a plan administrator, a transaction prohibited by ERISA § 406(b)(3).

187. In addition, the individual committee members, who were all employees of the Company, were paid salaries and bonuses by the Company for fulfilling a variety of duties, including serving on the Committee. Since the Company was a "party dealing with such plan" and since the compensation to the Committee members included salaries and bonuses that covered their work on the Committee, they received consideration from the Company in connection with the transactions at issue in this section.

188. The transactions, and the payment of salaries and bonuses to the Individual Committee members, were prohibited transactions in violation of ERISA § 406(b)(3).

### E.   Count V - Breach of Fiduciary Duty in Connection with Administrative Fees to Schwab

189. Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

190. Defendants are responsible for selecting, monitoring, negotiating with, and removing the Plan's Recordkeeper.

191. Defendants caused the Plan to pay, directly or indirectly, millions of dollars in excessive recordkeeping compensation to Schwab during the Class Period. Schwab's compensation was excessive and unreasonable given the services provided.

192. Defendants failed to monitor and control these costs despite lower-cost Recordkeeping alternatives.

193. By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

194. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

195. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess fees during the Class Period, and suffered lost opportunity costs that continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     A declaration that the Defendants breached their fiduciary duties under ERISA § 404 and engaged in prohibited transactions in violation of ERISA § 406.

B.     An order compelling the Defendants to restore all losses to the Plan arising from Defendants' violations of ERISA, including lost opportunity costs;

C.     An order granting equitable restitution and other appropriate equitable

1  monetary relief against Defendants;

2      D.      Such other equitable or remedial relief as may be appropriate, including

3  the permanent removal of Defendants from any positions of trust with respect to the

4  Plan and the appointment of independent fiduciaries to administer the Plan;

5      E.      An order certifying this action as a class action, designating the Class to

6  receive the amounts restored or disgorged to the Plan, and imposing a constructive

7  trust for distribution of those amounts to the extent required by law;

8      F.      An order enjoining Defendants collectively from any further violations of

9  their ERISA fiduciary responsibilities, obligations, and duties;

10     G.      An order awarding Plaintiff and the Class their attorneys' fees and costs

11 pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or the Common Fund doctrine,

12 and post-judgment interest; and

13     H.      An order awarding such other and further relief as the Court deems

14 equitable and just.

15 Dated: November 1, 2023                    Respectfully submitted,

16                                           */s/ Arthur H. Bryant*
17                                           Arthur H. Bryant
                                             Bailey & Glasser, LLP
18                                           999 Harrison Street, Suite 660
                                             Oakland CA 94612
19                                           Telephone: (510) 272.8000
                                             Facsimile: (510) 463.0291
20
                                             Gregory Y. Porter *(pro hac vice to be filed)*
21                                           Bailey Glasser LLP
                                             1055 Thomas Jefferson St., NW, Suite 540
22                                           Washington, DC 20007
                                             Telephone: (202) 463-2101
23                                           gporter@baileyglasser.com

24                                           Mark G. Boyko (*pro hac vice to be filed*)
                                             Bailey & Glasser, LLP
25                                           34 N. Gore Avenue, Suite 102
                                             Webster Groves, MO 63119
26                                           Telephone: (202) 463-2101
                                             mboyko@baileyglasser.com
27
                                             ***Attorneys for Plaintiffs***
28

39